# United States Court of Appeals

## For the First Circuit

No. 09-1624

AIRFRAME SYSTEMS, INC.,

Plaintiff, Appellant,

v.

RAYTHEON COMPANY; JOHN STOLARZ; L-3 COMMUNICATIONS HOLDINGS,
INC.; L-3 COMMUNICATIONS CORP.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young,  U.S. District Judge]

Before

Lynch, Chief Judge,
Souter, Associate Justice,* and Stahl, Circuit Judge.

        Peter B. Krupp with whom Lurie & Krupp, LLP and Bruce I. Afran
were on brief for appellant.
        John F. Batter III with whom Timothy J. Perla, Sarah W. Lowe,
and Wilmer Cutler Pickering Hale and Dorr LLP were on brief for
appellee Raytheon Company.
        Alan M. Gelb with whom Randi Maidman and Jones Hirsch Connors
& Bull, PC were on brief for appellee L-3 Communications
Corporation.

March 31, 2010

---

        *     The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LYNCH**, **Chief Judge**.  The question presented is whether the doctrine of claim preclusion bars the plaintiff, Airframe Systems, Inc. (Airframe) from pursuing a later 2007 copyright infringement action in Massachusetts when its earlier 2006 copyright action in New York, concerning the same series of events, was dismissed and Airframe took no appeal.

The wrinkle presented is that the earlier New York suit named as defendant L-3 Communications Corporation (L-3), the later owner of Aircraft Integration Systems (AIS), the business unit in both cases said to have infringed through use and/or possession of Airframe's software source code.  The later Massachusetts suit, on the other hand, named as defendant Raytheon, which owned AIS at the time of the alleged infringement.  Since Airframe was or should have been well aware of these facts when it filed the New York lawsuit, and should have amended its suit there, we agree with the district court that the Massachusetts action is barred.  On appeal, Airframe challenges the dismissal of its suit only with respect to Raytheon and has waived the argument that its suit against L-3 was not precluded.  The allowance of the motion to dismiss is affirmed.

We summarize our reasoning. Airframe makes two arguments as to why the present suit against Raytheon is distinguishable from the New York suit for claim preclusion purposes.  First, it says the causes of action in the New York suit, which claimed infringement based on unauthorized possession of its source code,

-2-

are different from its present claims of infringement based on the unauthorized use of its source code to modify software. But both claims arise from the same series of events in the same timeframe and meet the common nucleus of operative fact test. Airframe could have made both claims in the New York suit and chose not to do so. Moreover, Airframe sought leave to amend its New York complaint to add the infringing use claim; the New York court impliedly denied the request, and Airframe did not appeal that decision.

Second, Airframe argues that the New York suit only named L-3 as a defendant and should not bar its present suit as to Raytheon, which it says was not an identical party to L-3 because they were not in privity. But modern claim preclusion doctrine need not be analyzed solely in terms of common law concepts of privity. On the facts of this case, Raytheon and L-3 were sufficiently related parties for Raytheon to be able to invoke claim preclusion in the Massachusetts suit. Airframe's claims are, and always have been, about the actions of a single business unit, AIS. Raytheon and L-3 had a close and significant relationship as AIS's former and current owners in the relevant period. In the New York suit, Airframe could have sued Raytheon and L-3, but instead tried to hold L-3 liable for AIS's actions under both L-3's and Raytheon's ownership. Airframe made a number of strategic choices; claim preclusion doctrine requires it to live with those choices.

I.

Our review of a district court's allowance of a motion to dismiss for failure to state a claim on preclusion grounds is de novo. See Haag v. United States, 589 F.3d 43, 45 (1st Cir. 2009). We accept all well-pleaded facts in the complaint as true, and we draw all reasonable inferences in plaintiff's favor. See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009). Other undisputed documents about the New York proceedings were also properly before the district court and us.

AIS is in the business of systems integration, in the course of which it modernizes and maintains aircraft for its customers. As part of that business, AIS uses certain software to manage the servicing and maintenance of airliner fleets. Since at least 1987, AIS has purchased and renewed an annual license for Airframe's Maintenance and Engineering software suite, a copyrighted program that performs those functions.

Around 1997 or 1998, John Stolarz, a former Airframe employee, went to AIS offices for a maintenance visit to address installation issues AIS was having with the Maintenance and Engineering software.[1]  Once at AIS, Stolarz, supposedly without

---

[1]    Airframe suggests that this visit occurred in 1997, while Raytheon documents indicate that the visit likely occurred in 1998. The parties agree, however, that this visit was the only time when Airframe source code could have been downloaded onto AIS computers and when the source code was used to modify software to make it compatible with AIS's newer computers. Whether this happened in 1997 or 1998 is not material to our analysis.

-4-

Airframe's authorization, allegedly downloaded Airframe's copyrighted software source code onto an AIS computer. Software source code is the base that software programmers use to create various software applications and can be used to modify and upgrade those applications. Stolarz allegedly used the source code to modify the Maintenance and Engineering software so that it would run on newer AIS computers. The source code remained on AIS's system, and AIS apparently used the modified software on its newer computers for some unspecified period thereafter. Nonetheless, subsequent discovery indicated that AIS stopped using the modified program before Raytheon sold AIS to L-3.

Raytheon owned AIS from 1995 to 2002, during which time AIS was an unincorporated business division of Raytheon.[2] In 2002, defendant L-3 purchased AIS's assets from Raytheon, and AIS became an unincorporated division of L-3. See Anthony L. Velocci, Jr., L-3's Acquisition of AIS Alters Competitive Field, Aviation Wk. & Space Tech., Jan. 21, 2002, at 37. L-3 also became the successor licensee for the Airframe Maintenance and Engineering software.

In 2003, during a trouble-shooting session at AIS offices, Airframe discovered that the Airframe source code was on AIS's computer network. Airframe's president, Gordon Rosen, asked

---

[2] Raytheon created AIS by combining the operations of two prior companies: E-Systems, Inc., which it acquired in 1995, and Chrysler Technologies Airborne Systems, which it acquired in 1996. See L-3 Communications Integrated Systems Group, About Us, http://www.l-3com.com/is/aboutUs.html (last visited Mar. 7, 2010).

for an explanation, and L-3 sent a September 10, 2003 letter to Airframe explaining that Airframe employee John Stolarz was the only person who could have installed the source code.

Also in 2003, in connection with unrelated litigation between Stolarz and Airframe in the federal district court for the Southern District of New York, Airframe subpoenaed documents in L-3's possession regarding AIS's prior dealings with Airframe and Stolarz. One of these documents, dated June 2, 1998, was a request from AIS, on Raytheon letterhead, addressed to Stolarz at Airframe. The request stated that AIS was having problems using certain software on its newer computers and prompted Stolarz's visit to AIS to address the issue. It was during this visit that the alleged download of the Airframe source code occurred.

In 2005, Airframe sued L-3 and Stolarz in the U.S. District Court for the Southern District of New York. The complaint alleged that AIS had purchased the initial license for the Airframe Maintenance and Engineering software suite, and that L-3, as AIS's present owner, was liable for any infringements. The complaint asserted, among other claims, that L-3 (1) had conspired with Stolarz to obtain Airframe's source code and that Airframe had discovered L-3's possession of its code in 2003; (2) that L-3 could have used the source code to modify and update Airframe software without paying Airframe for license renewals or software updates, though the complaint did not claim such use had occurred; and (3)

that L-3's ongoing possession of the source code infringed Airframe's exclusive rights under the Copyright Act. L-3 then filed a motion to dismiss for failure to state a claim.

During a March 2, 2006, hearing in New York, L-3's counsel explained his understanding of what had happened during Stolarz's visit to AIS in the late 1990s, when AIS was owned by Raytheon. L-3's counsel stated that Stolarz appeared to have installed the Airframe source code on an AIS computer and had used it to modify the licensed Airframe Maintenance and Engineering software. Airframe's counsel portrayed L-3's counsel's statement as a concession and asserted it was only at this point that it learned that L-3, through AIS, had used, and not merely possessed, Airframe's source code. Airframe urged that the alleged concession of use created a new issue. The court invited Airframe to file a letter, which the court would use to determine whether the complaint was sufficient and, if not, whether an amendment would cure any defects. Airframe did so. Airframe's March 17, 2006, letter stated that it was prepared to file an amended complaint incorporating new claims of L-3's unauthorized use of its source code, but it did not attach an amended complaint or file a formal motion.

The court did not explicitly rule on whether Airframe could amend its complaint. On September 6, 2006, the New York court dismissed the complaint for failure to state a claim. It

held that because Airframe's complaint had not alleged that L-3 had actually used the source code, only that it could have done so, Airframe could not show infringement under the Copyright Act. See Airframe Sys., Inc. v. L-3 Commc'ns Corp., No. 05-cv-7638, 2006 WL 2588016, at *3-4 (S.D.N.Y. Sept. 6, 2006). Airframe did not appeal either the merits of this decision or the court's failure to act on its stated intention to amend the suit to allege infringing use.

Having lost in New York, on January 26, 2007, Airframe filed suit against L-3[3] and John Stolarz[4] in the federal district court of Massachusetts and, for the first time, also named Raytheon as a defendant. The complaint alleged that AIS, under Raytheon's ownership, had conspired with former Airframe employee Stolarz to obtain Airframe's source code. It further stated that Raytheon, through AIS, had infringed Airframe's copyright both by possessing the source code and by using the code to make the Maintenance and Engineering software compatible with AIS's new computers. The complaint alleged that defendant L-3 became the "successor

_____

[3] Airframe sued both L-3 Communications Corporation, the defendant in the New York action, and L-3 Communications Holdings, Inc., the corporate owner of L-3 Communications Corporation. Airframe referred to the two companies collectively as "L-3" and has drawn no distinction between them. Corporate parents and subsidiaries are generally considered identical parties for claim preclusion purposes, see, e.g., In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 17 (1st Cir. 2003), and we also refer to these parties collectively as "L-3."

[4] Stolarz is not a party to the present appeal. The district court granted his motion to dismiss for lack of personal jurisdiction, and Airframe does not challenge that ruling.

-8-

licensee" of the Airframe software when it acquired AIS's assets from Raytheon in 2002, that L-3 had continued to possess the source code, and that it had continued to use the AIS computers running the modified software. This, the complaint alleged, made L-3, "as successor to Raytheon," responsible for infringements based on possession and use after 2002. The suit again sought recovery under the Copyright Act, among other claims.

On May 9, 2007, L-3 and Raytheon both filed a motion to dismiss on the basis of claim preclusion, and on October 31, 2007, the Massachusetts district court granted this motion as to both parties.[5] Airframe has appealed only the dismissal of Raytheon.

## II.

Federal claim preclusion law applies to determine the preclusive effect to be given a prior federal court judgment. See Coors Brewing Co. v. Méndez-Torres, 562 F.3d 3, 8 (1st Cir. 2009). Federal claim preclusion law bars parties from relitigating claims that could have been made in an earlier suit, not just claims that were actually made. See Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981); Haag, 589 F.3d at 45.

---

[5] The district court held that all claims of infringement against L-3 and Raytheon arising before September 6, 2006, the date of the New York action, were precluded. It permitted the suit to go forward as to any claims of infringement after that date. The remainder of the case was dismissed on April 7, 2009, after Airframe told the court it no longer intended to pursue those claims because discovery had revealed that Raytheon stopped using the modified program before selling AIS to L-3.

The doctrine of claim preclusion serves at least two important interests: protecting litigants against gamesmanship and the added litigation costs of claim-splitting, and preventing scarce judicial resources from being squandered in unnecessary litigation. See Sutliffe, 584 F.3d at 329. Those interests are especially implicated in a case like this, where the plaintiff had every opportunity to fully litigate its various claims against the full range of defendants in an earlier suit and made the strategic choice not to do so. Plaintiffs cannot obtain a second chance at a different outcome by bringing related claims against closely related defendants at a later date.

Claim preclusion applies if (1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related. See id.; Negrón-Fuentes v. UPS Supply Chain Solutions, Inc., 532 F.3d 1, 10-11 (1st Cir. 2008); Apparel Art Int'l, Inc. v. Amertex Enter., Ltd., 48 F.3d 576, 583-84 (1st Cir. 1995).

There is no dispute as to the first of the three prongs in the analysis. The dismissal of the New York suit for failure to state a claim was plainly a final judgment on the merits, see AVX Corp. v. Cabot Corp., 424 F.3d 28, 30 (1st Cir. 2005). Airframe argues that the second and third criteria have not been met.

-10-

We hold that Airframe should have brought its use claim in the New York action, either in the initial complaint or in an amended one, because its claims of infringing possession and use are so closely related. We further hold that Airframe should have named Raytheon as a defendant in the New York action given Raytheon's close relationship with L-3 as to AIS's operations during the relevant time period. Finally, we conclude there is no unfairness to Airframe in applying claim preclusion.

A.        The Causes of Action Are Sufficiently Related

This court uses a transactional approach to determine whether the asserted causes of action are sufficiently identical or related for claim preclusion purposes. A "cause of action" in this context includes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." United States v. Cunan, 156 F.3d 110, 114 (1st Cir. 1998) (quoting Manego v. Orleans Bd. of Trade, 773 F.2d 1, 5 (1st Cir. 1985) (internal quotation marks omitted).

This inquiry does not turn on the labels the plaintiff attaches to its various claims, but rather "boils down to whether the causes of action arise out of a common nucleus of operative facts." Mass. Sch. of Law at Andover, Inc. v. Am. Bar. Ass'n, 142 F.3d 26, 38 (1st Cir. 1998). We determine that by looking to factors such as "whether the facts are related in time, space,

-11-

origin or motivation," "whether they form a convenient trial unit," and whether treating them as a unit "conforms to the parties' expectations."  In re Iannochino, 242 F.3d 36, 46 (1st Cir. 2001) (quoting Restatement (Second) of Judgments § 24 (1982)) (internal quotation marks omitted).

We clear away some underbrush.  Airframe's assertion that claim preclusion applies only to those issues that were actually determined by the court in the previous suit is plainly incorrect and relies on cases involving issue preclusion, not claim preclusion.  The relevant question remains whether Airframe's claims of infringing possession (assuming such a claim can be brought at all) and infringing use share a common nucleus of operative facts.

Airframe's claims of infringement through possession and infringement through the use of its source code clearly arise from the same common core of facts in the same timeframe.  Airframe's complaints in both suits asserted that AIS's allegedly unauthorized possession of Airframe's source code began when Stolarz installed the source code on an AIS computer in 1997 or 1998.  Airframe's claim of infringing use arises from Stolarz's apparent use of the source code to modify software to run on a newer AIS computer during the same maintenance visit.  These infringements continued for years, Airframe says, simply because the source code remained

-12-

on AIS's system and because AIS continued using the modified software.[6]

Even if we assume hypothetically that there was a separate infringement cause of action for possession, at trial the claims of infringement based on possession and use would have relied on the same witnesses and evidence. Airframe's statement of its desire to amend its New York complaint with the infringing use claim evidences that these claims could have foreseeably been brought together.

Airframe says it had no way to bring the claim of infringing use when the New York suit was filed because it only learned of this alleged development in the course of litigation. That is not true. Airframe had the relevant facts concerning Stolarz's visit in its possession well before it filed the New York complaint in 2005, thanks to documents it had already subpoenaed from L-3 in connection with an unrelated suit against Stolarz in 2003.

---

[6] Airframe also tries to argue that because the New York suit was only directed against L-3, and L-3 only purchased AIS in 2002, the New York suit was necessarily only about infringements after that date, whereas the present suit seeks to hold Raytheon accountable for earlier infringements as well. But that argument is plainly contradicted by the wording of Airframe's New York complaint, which accused L-3, through AIS, of conspiring with Stolarz to obtain the original source code and accused it of infringements thereafter. Airframe's imprecision as to the date when AIS obtained the source code, and the resulting question of whether this happened under Raytheon or L-3 ownership, does not change the essential nature of the claims.

Nor does Airframe's failure to get leave from the New York court to amend its complaint somehow deprive the New York judgment of preclusive effect. Airframe could have appealed and did not. Airframe also hypothesized that the New York court's implicit denial of that request was not based on the merits. It then argued the nonsequitur that this must mean there is no preclusive effect. But Airframe decided not to appeal the New York court's decision not to let it amend its complaint, and that outcome is the same regardless of the New York court's reasoning. On these facts, Airframe's recourse was to appeal, not to start a new action. Under these circumstances, and given Airframe's strategic choice of litigation tactics, Airframe is not entitled to a second opportunity to litigate this claim.[7] See Johnson v. SCA Disposal Servs. of New England, Inc., 931 F.2d 970, 975-76 (1st Cir. 1991) (holding that an appeal of the denial of plaintiff's motion to amend the complaint to add an additional claim was plaintiff's "only recourse," and a new suit based on the additional

_____

[7] For these reasons, even if Airframe had not waived any appeal from dismissal of L-3, the present suit against L-3 would still be precluded. Airframe's only argument as to L-3, asserted at oral argument in response to a question from the bench, was that the New York claims against L-3 involved infringement based on possession, whereas the present claims involved claims of infringing use. This is the same argument discussed and rejected above. Moreover, Airframe's admission that discovery revealed AIS had stopped using the modified software before the division was sold to L-3 would, in any event, appear to undercut all the factual predicates for the claim of infringing use against L-3 alleged in the Massachusetts complaint.

-14-

claim was barred by claim preclusion, especially in light of indications that the failure to include the additional claim was a "calculated tactical decision"); see also EFCO Corp. v. U.W. Marx, Inc., 124 F.3d 394, 399-400 (2d Cir. 1997) (holding that "[w]here a plaintiff's motion to amend its complaint in the first action is denied, and plaintiff fails to appeal the denial, res judicata applies to the claims sought to be added in the proposed amended complaint" where those claims arose from the same transactions as the initial claims); Restatement, supra, § 25 cmt. b (noting that a "mere shift in the evidence offered to support a ground held unproved in a prior action will not suffice to make a new claim avoiding the preclusive effect of the judgment" and that "[i]t is immaterial that the plaintiff in the first action sought to prove the acts relied on in the second action and was not permitted to do so because they were not alleged in the complaint" and the plaintiff was unable to amend the complaint). Thus, there was claim preclusion as to the use claim.

B.       The Parties Are Sufficiently Closely Related

We ask whether Raytheon and L-3 were sufficiently related parties for Raytheon, the new defendant, to assert claim preclusion as a defense in the present action.

Claim preclusion does not merely bar a plaintiff from suing the same defendant for the same claims in a different action; under certain circumstances, a defendant not a party to an original

-15-

action may also use claim preclusion to defeat the later suit.[8]  We flatly reject Airframe's contention that nonparty defendants to an initial action can invoke claim preclusion as a defense in a later suit only if they can show that the nonparty defendant was in privity with the initial defendant, for instance because the new defendant controlled the earlier litigation or used an original defendant as its de facto representative.

Under our precedents, privity is a sufficient but not a necessary condition for a new defendant to invoke a claim preclusion defense.  We, along with other circuits, have long held that claim preclusion applies if the new defendant is "closely related to a defendant from the original action-who was not named in the previous law suit," not merely when the two defendants are in privity.  Negrón-Fuentes, 532 F.3d at 10; see id. (collecting cases); Hermes Automation Tech., Inc. v. Hyundai Elec. Indus. Co., Ltd., 915 F.2d 739, 751 (1st Cir. 1990) (reaffirming the "close and significant" relationship test); In re El San Juan Hotel Corp., 841 F.2d 6, 10-11 (1st Cir. 1988) (holding that the new defendant, an alleged co-perpetrator of the financial harms litigated in the first lawsuit, had a sufficiently close relationship to the original defendant so as to invoke claim preclusion as a defense);

_____

    [8]    Though "[t]he judicial expansion of claim preclusion doctrine . . . has not gone unchecked," Negrón-Fuentes, 532 F.3d at 10, cases like Taylor v. Sturgell, 128 S. Ct. 2161 (2008), have limited the circumstances under which nonparty plaintiffs are precluded from suing the same defendants, id. at 2172-75.

-16-

see also Gambocz v. Yelencsics, 468 F.2d 837, 841-42 (3d Cir. 1972) (holding that unnamed co-conspirators sued in a subsequent suit could assert a claim preclusion defense when plaintiff had sued other conspirators on the same claims in the first suit).

In the corporate context, other circuits have recognized that this kind of "close and significant relationship" may exist between a parent corporation and a subsequently sued affiliate, see Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 966 (3d Cir. 1991), or between a corporation and its successor, see Russell v. SunAmerica Sec., Inc., 962 F.2d 1169, 1175-76 (5th Cir. 1992). This circuit has not previously addressed the circumstances under which a successor or predecessor corporation not party to an initial suit might invoke claim preclusion as a defense in a later action.

Whether a "close and significant relationship" exists between an original defendant and a defendant only named in a later suit varies with the facts. For instance, "where some alleged conspirators are sued in the first (unsuccessful) action and the remainder in a second suit based on the same allegations," or where "a government is sued first (unsuccessfully) and officers in their personal capacities sued afterwards on the same theory," courts have held the later defendants could raise claim preclusion as a defense. Negrón-Fuentes, 532 F.3d at 10; see also 18A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4464.1, at 720 n.6 (2d ed. 2002) (collecting cases in which new defendants

-17-

successfully asserted nonmutual claim preclusion).  The common factors in these cases were that "the [later] claims were or could have been brought against the original defendant in the original suit" and the subsequent suit tried to hold related defendants liable on related claims.  Id.[9]

Here, all of Airframe's claims of infringement against L-3 and Raytheon in the present suit could have been brought against L-3 in the original suit.  Indeed, in the New York suit, Airframe brought claims against L-3 for alleged infringements dating from the time AIS acquired Airframe's source code--that is, while Raytheon owned AIS--to 2006, the date of the New York suit.

Airframe argues that it had no way of knowing that AIS obtained Airframe's source code during Raytheon's ownership, and that it would have therefore been impossible to sue Raytheon when the initial complaint was filed.  But we need not reach the complexities of when parties must amend their complaints in light of newly discovered information in the course of litigation.  This contention, like Airframe's related claim that it had no way of

_____

[9]    Those conditions were not met on the facts of Negrón-Fuentes, where we held that the plaintiff could maintain certain new claims against the additional defendants even assuming that those claims arose from the same transaction as the claims plaintiff had brought in his earlier, unsuccessful suit. 532 F.3d at 10.  There, the plaintiff initially sued his employer and later brought ERISA claims against the administrators of plaintiff's health care plan.  Id. at 9-10.  But ERISA applies only to plan administrators, sponsors, and fiduciaries, and plaintiff could not have brought ERISA claims against his employer in the initial suit.  Id.

knowing about the alleged infringing use, is again contradicted by the documents in Airframe's possession before it filed the New York complaint.  Those documents plainly showed that Raytheon was AIS's owner in 1998, when Stolarz was allegedly asked to assist AIS with problems on its newer computers.  Airframe was perfectly aware that AIS had been previously owned by Raytheon, but nonetheless attributed all of AIS's pre-purchase actions to L-3.[10]

In sum, in each suit the wrongful action complained of was allegedly taken by the AIS division.  In each suit, the corporation was named only because it was the superior organization that included AIS, not because of any wrongful action taken outside that division.  In each suit, the basis for claiming the named corporation's liability for the actions of AIS was identical to the grounds claimed in the other suit.  The corporations were thus treated as interchangeable proxies for reaching the actions of AIS.  Since Airframe was in a position to know (and did know) about each one during the pendency of the earlier litigation, it is reasonable to treat the two as closely related for purposes of claim preclusion.

---

[10]     Airframe also could have easily found out, through public filings and its own documentation of AIS software license renewals, that L-3 only acquired AIS in 2002.  Airframe was likewise in a position to know that the source code had been transferred around 1997, given that its complaint stated that its own former employee, Stolarz, apparently transferred the code.

Finally, we see no unfairness to Airframe. It made choices to bring piecemeal and sequential litigation, apparently hoping this strategy would maximize its chances of recovery through settlement or trial. This is a case where "the new party can show good reasons why [it] should have been joined in the first action and the old party cannot show any good reasons to justify a second chance." 18A Wright et al., supra § 4464.1, at 727.

We affirm the district court's dismissal of this suit.

So ordered.